ELROD *v.* ELROD.

4-4238

Opinion delivered March 23, 1936.

*C. W. Garner, G. W. Fike* and *McDaniels & Crow,* for appellants.

*House, Moses & Holmes* and *Richard C. Butler,* for appellees.

BAKER, J. This suit was one to quiet title to a piece of real property situated in Saline County, which real property was at one time owned by George Elrod. George Elrod was the father of John J. Elrod and George Milton Elrod. The appellants, who were plaintiffs in the trial court, are the children of John J. Elrod, and appellees are children of George Milton Elrod. All of them claim title to the said property from their grandfather as a common source.

George Elrod died in 1889. It is alleged that after he had grown old he bought a piece of property near his son, John J. Elrod, in order that he might be taken care of by John J. Elrod, with whom he made an agreement that upon death of himself and his wife, father and mother of John J. Elrod, in consideration of caring and providing for them in their old age, that John J. Elrod should have his property. A short time before the death of George Elrod he went to live in the home of John J. Elrod, but, thereafter, a few months before his death, he moved from that place to the home of his daughter, Mrs. McAdams, and it was at that home that he and his wife died. At any rate, John J. Elrod was left in possession of the real property owned by George Elrod at the time of his death, and continued in possession thereof until he died in 1926, and some of his children have remained in possession since that day.

Although it is seriously asserted and urged here that John J. Elrod should be declared the owner by reason of the services rendered by him to his father, under an agreement that he should be compensated therefor, under the contract whereby he was to receive his father's prop-

erty for such services, John J. Elrod made no effort, after his father died, to perfect title to himself to this property until a short time before he died in 1926. A short time before his death he did make an effort to get quitclaim deeds from some of the kindred.

Appellees offered a letter which was said to have been written by John J. Elrod in 1909 to George Milton Elrod, his brother. The letter is as follows: "Dear Brother: I take pleasure in writing you a few lines. This leaves us well, hoping it will find you all the same. Well, Bud, I got a letter from Charlie Lewis the other day to come down and buy Laura's part of this place, or sell my part of it. I went down to see him Sunday and he says if I will sell him my part he will put it in court at once. And I want the place to cultivate as my land is getting so it will not make anything, but I cannot afford to pay them for my part of the place and pay the rest of the heirs too. And if I sell to them he says he is not going to say anything to the rest of the heirs about it, but just fight it out in the court. He has that account of $250 that he is going to put in against the place and the court will allow it to them, and if it will take the whole place to pay it, I will have to pay that account in order to get the place. Now, I want to know who you would rather give your part to, to me or Charlie Lewis. If you cannot come out, let me know at once because I haven't but about 10 days to decide. Come if you can get off and advise me what to do. From your brother, John J. Elrod, Bryant, Arkansas."

This letter was written about twenty years after the death of their father. The Charlie Lewis mentioned in the letter is said to be the son-in-law of Mrs. McAdams, the sister of John J. Elrod and George Milton Elrod.

There was some conflicting testimony relative to the alleged contract between father and son in regard to the property. A larger part of the testimony, however, dealt with the proposition of the possession of John J. Elrod and his children during the respective periods, from the date of the death of George Elrod in 1889 to the date of the death of John J. Elrod in 1926, and the possession of the children of John J. Elrod from 1926

and the date of the filing of the suit to quiet title to this property. The decree of the trial court was to the effect that said alleged contract was not satisfactorily proved; that all of the parties claimed title from a common source, were tenants in common, and that John J. Elrod and his heirs have not held adversely or under such conditions as to give notice of such adverse claim or holding as would set in motion the statute of limitations and thereby bar the claim of the appellees. It is to correct the alleged error in this decree that this appeal has been prosecuted.

We think the chancellor was correct in his findings of fact and declarations of the law.

No useful purpose will be served by an attempt to set forth and argue the facts in relation to the alleged contract for services rendered by the son to his parents. Conditions seem from the record presented here not materially different from those that occur in many families where the ordinary affections exist, as between parents and children. There is no presumption under such conditions that parents expect to pay or that children expect to receive compensation for such services. The presumption is to the contrary. *Graves* v. *Bowles,* 190 Ark. 579, 79 S. W. (2d) 995. It must therefore follow that one relying upon such contract must be able to establish it by a preponderance of the evidence, and, failing to do so, cannot recover.

It must be evident that when John J. Elrod wrote the letter above set forth, twenty years after his father died, he himself was not then relying upon any contract whereby his father was to transfer or convey the real property to him. This letter contradicts that theory.

It is true, as argued in appellant's brief, that his first concern at that time was about this twenty-year-old claim of $250 made by his sister's son-in-law, which was giving him considerable worry, and on account of which he thought he might have to yield possession of the property in order that this claim might be paid. One so conscientiously concerned about the payment of this twenty-year-old debt would most probably have been believed had he at a proper time asserted his claim of ownership to the property. It is true he was trying to get title to

462

the property just a short time before he died, but this was not by way of denial by him that others had an interest therein, but rather in recognition of their rights, which he sought to have conveyed to him. It must, perforce, appear that no substantial right existed under such alleged contract as appellants now set up.

The only other question remaining in this case is that of adverse possession. The propositions of law governing this situation are well settled and recognized. The possession of some of the joint tenants, or tenants in common, is the possession of all, and continues to be such until there is some act of ouster sufficient in itself to give notice that those in possession are claiming in hostility to, and not in conformity with, the rights of others having interests in the property. *Keith* v. *Wheeler,* 105 Ark. 318, 151 S. W. 284. One in possession is presumed to hold in recognition of the rights of his cotenants. *Patterson* v. *Miller,* 154 Ark. 124, 241 S. W. 875. A great number of citations support this proposition. It is unnecessary to extend this opinion by including them.

A thorough examination of this record is convincing that the trial court was correct in his findings of fact and declarations of law, and the decree is therefore affirmed.